## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NEUTRAL POSTURE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action No. _____ |
| **v.** | ) | |
| | ) | |
| **MILLERKNOLL, INC. (successor in** | ) | |
| **interest to KNOLL, INC.),** | ) | JURY TRIAL DEMANDED |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff, Neutral Posture, Inc. ("Neutral Posture") hereby states as follows in support of its claims against Defendant MillerKnoll, Inc. ("Knoll") (Neutral Posture and Knoll collectively, as the "Parties"):

## NATURE OF THE ACTION

1.      This is an action involving infringement of registered trademarks under the Lanham Act of 1946, as amended, 15 U.S.C. §§ 1051 *et seq.*, and violations of Pennsylvania common law.

## PRELIMINARY STATEMENT

2.      Despite Knoll having sold all right and title to the intellectual property associated with the commercial office furniture line known as Equity®, including a federally registered trademark to Neutral Posture in 2014, Knoll has continuously and brazenly infringed Neutral Posture's exclusive right to trade under the Equity name brand.

3.      This action seeks to redress Knoll's willful infringement of Neutral Posture's Equity trademark, among other related transgressions of related Pennsylvania common law.

4.      Knoll has relied on half-truths and bully tactics to unlawfully profit off the back of property and exclusivity rights bought and paid for by Neutral Posture.

**PARTIES**

5.      Plaintiff Neutral Posture is a Texas corporation with its principal place of business at 3904 North Texas Avenue, Bryan, Texas, 77803.

6.      Neutral Posture manufactures and sells commercial office furniture and has done so since January 1, 1989.

7.      Neutral Posture was founded by mother daughter team Rebecca Boenigk and Jaye Elizabeth Congleton.

8.      Neutral Posture's flagship product was an ergonomically designed office chair based on Ms. Boenigk's father's research and development at Texas Tech using research from NASA and his experience as an air force fighter pilot.

9.      Other than a brief period of trading on the NASDAQ stock exchange from 1997 to 2001, Neutral Posture has been a private family run business.

10.     On July 19, 2021, Knoll, Inc. a Delaware corporation with a principal place of business located in the Commonwealth of Pennsylvania at 1235 Water Street East, Greenville, Pennsylvania 18041, was acquired by Herman Miller, Inc., a publicly traded Michigan corporation listed on the NASDAQ stock exchange using the ticker symbol MLHR.  Following this acquisition, the combined company used the name MillerKnoll, Inc., a publicly traded Michigan corporation listed on the NASDAQ stock exchange using the ticker symbol MLKN.

11.     Throughout the relevant time period of this action, Knoll, Inc. maintained a Philadelphia showroom to market its products to customers in the Commonwealth of Pennsylvania.

12.     On information and belief, Knoll, Inc. is a predecessor in interest to Defendant MillerKnoll, Inc.

13.     MillerKnoll, Inc. is a publicly traded Michigan corporation, whose principal place of business is 855 East Main Avenue, Zeeland, Michigan 49464, also manufactures and sells commercial office furniture.

14.     MillerKnoll, Inc. holds itself out as one of the largest modern home and office design companies in the world.[1]

15.     Defendant Knoll maintains showrooms around the country, including a showroom located at One Logan Square, 130 N. 18th Street, Suite 2510, Philadelphia, Pennsylvania 19103.

16.     According to Defendant Knoll's July 26, 2022 Form 10-K Annual Report, the company had a revenue of $3.946 billion dollars and a market capitalization of $2.47 billion dollars.

## JURISDICTION AND VENUE

17.     This Court has personal jurisdiction over Knoll because it transacts business in Pennsylvania and within this judicial district; because it has engaged in business activities directed to the Commonwealth of Pennsylvania and within this judicial district; because it has knowingly committed tortious acts aimed at and causing harm within the Commonwealth of Pennsylvania and this judicial district; and because Neutral Posture suffered harm within this judicial district as a result of Knoll's conduct complained of herein.

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Neutral Posture's claims are, in part, based on violations of the Lanham Act of 1946, as amended, 15 U.S.C. §§ 1051 *et seq.*

19.     This Court has jurisdiction over the subject matter of this dispute pursuant to 15

---

[1] "Herman Miller and Knoll Announce New Name: MillerKnoll," HERMANMILLER, July 20, 2021, *available at* https://www.hermanmiller.com/en_lac/press/press-releases/herman-miller-and-knoll-announce-new-name-millerknoll/#:~:text=Herman%20Miller%20(NASDAQ%3A%20%5BMLHR,will%20move%20forward%20as%20 MillerKnoll.

U.S.C. §§ 1121(a) and 28 U.S.C. §§ 1331 and 1338.

20.     This Court also has supplemental jurisdiction over the common law claims pursuant to 28 U.S.C. §§ 1338(b) and 1367(a) because those claims are so related to the federal claims arising under the Lanham Act that they form part of the same case or controversy and derive from a common nucleus of operative facts.

21.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the acts giving rise to the claims alleged herein occurred in this district, Defendant Knoll is located in this district, and the transactions or occurrences out of which the cause of action arose took place in this jurisdiction.

## FACTUAL ALLEGATIONS

A.  *The Equity® Line of Intellectual Property*

22.     Upon information and belief, in about November of 1992 Knoll's predecessor-in-interest began using the trademark EQUITY on an office furnishings panel series used in connection with office furniture and office furniture systems.

23.     On or about August 4, 1992, the United States Patent and Trademark Office ("USPTO") issued a federal registration No. 1,763,700 ("the '700 Registration") for the trademark Equity® to Knoll's predecessor-in-interest for portable wall panels (hereinafter the "EQUITY Mark").  Exhibit 1, a true and correct status copy of U.S. Reg. No. 1,763,700 issued by the USPTO.

24.     On April 4, 1996 Knoll, an office furniture supplier, acquired over 60 trademarks from its predecessor-in-interest relating to office furniture and office furniture systems, including the EQUITY trademark.

25.     After acquiring all right, title and interest in the EQUITY Mark, Knoll continued to maintain the '700 Registration and represented to the USPTO that it was in use in connection with

portable wall panels, filing specimens of use in 2003 and 2008 which described the goods as "office furnishing panel series."

26.     The '700 Registration is incontestable, and constitutes evidence of the EQUITY Mark's validity and subsistence, as well as the EQUITY Mark owner's exclusive right to use the mark for the goods and services specified in its registration.

27.     Upon information and belief, the EQUITY Mark has been used since November 1992 in connection with the manufacturing, advertising, and sale of portable wall panels which, together with other office furniture items, are collectively known as "systems" furniture (the "EQUITY Line")

28.     The EQUITY Line "systems" rely on the portable wall panels as a foundation, to which additional components can be attached, including but not limited to work surfaces, tables, desks, filing cabinets, and shelving, and chairs.

29.     The "systems" can be flexibly configured to form, for example, cubicle, open plan, and benching environments within a given work space.

30.     Distributors purchase and resell the EQUITY Line for installation and use in large commercial offices.  Neutral Posture also sells the EQUITY Line directly to customers.

B. *Knoll's Sale of the EQUITY Mark to Neutral Posture*

31.     For several years leading up to September 2, 2014, Knoll had been trying to "sunset" the EQUITY furniture Line.

32.     To that end, Knoll had been actively dissuading existing and prospective EQUITY Line customers from purchasing these products and recommended its other systems office furniture lines instead: **Dividends** and **Currents**.

33.     In early 2014, Knoll decided that it would discontinue the EQUITY Line altogether.

34.     Coincidentally, by 2014, Neutral Posture, a furniture manufacturer, was interested in expanding into systems office furniture and had begun exploring acquisition of existing marks related to system office furniture and the goodwill associated therewith.

35.     Although Knoll had been actively "sunsetting" the EQUITY Line, it decided to extract some additional, final value from the line, by marketing it (and the associated EQUITY Mark) for sale to Neutral Posture.

36.     To that end, Knoll's then Executive Vice President of Systems Furniture, Enrico Colzani, eventually engaged with Neutral Posture's CEO Rebecca Boenigk to negotiate the sale of the EQUITY Mark and the EQUITY Line business associated therewith from Knoll to Neutral Posture.

37.     During the course of those negotiations Mr. Colzani, affirmatively represented the degree to which the EQUITY Line would continue to generate significant future sales revenue and stated that it had been attempting to "sunset" the line and the EQUITY Mark, the demand remained high for the line.

38.     On or around June 23, 2014, Mr. Colzani met with Neutral Posture's CEO and Vice President of Sales in Knoll's Philadelphia showroom.

39.     Mr. Colzani told Neutral Posture that, with EQUITY's legacy customers, Neutral Posture should expect approximately $10,000,000.00 in sales revenue each year if it were to buy the EQUITY Line, the EQUITY Mark, and the business associated therewith.

40.     Mr. Colzani also told Neutral Posture that, even though Knoll had tried to funnel prospective EQUITY customers to its competing product lines (Dividends and Currents) from 2009 to 2014, customers had nevertheless maintained a multi-million dollar appetite for the Equity Line each year.

41.     On or about September 2, 2014, Neutral Posture and Knoll entered into an Asset Purchase Agreement (the "September 2, 2014 APA") which contemplated the purchase and sale of the entire Equity Line, including the EQUITY Mark and the attendant goodwill, among other assets.

42.     Pursuant to the September 2, 2014 APA, on or about November 20, 2014, Neutral Posture transferred a substantial sum to Knoll as a deposit against the purchase price while the parties continued to negotiate an amendment to the deal.

43.     On or about December 23, 2014, the parties consummated an Amended and Restated Asset Purchase Agreement ("APA"), which superseded and replaced the September 2, 2014 APA.  A true and correct copy of the APA is attached hereto and incorporated herein as Exhibit 2.

44.     The APA provided that "Seller[2] currently manufactures a line of furniture products known as Equity® (the 'Product Line')," and that the Seller "will sell and assign to Buyer, and Buyer will purchase and assume from Seller, the rights and obligations of Seller in, to and under the Assets and the Assumed Liabilities. . ."

45.     Knoll's sale of EQUITY encompassed EQUITY "Intellectual Property,"[3] "equipment, machinery, tooling and fixtures," "raw material, work-in-process, finished goods and spare part inventory."

46.     Under the APA, Knoll agreed, among other things, to "sell, assign, transfer, convey

---

[2] Capitalized terms used herein are defined the same as their definition under the APA.
[3] Defined in the APA as "the United States trademark 'Equity®,' US Reg. No. 1,763,700 (the 'Trademark')(and any word, name, symbol, design, graphic, logo, device, or any combination thereof used by Seller to identify and distinguish the Product Line from another source), and all other intellectual property assets of Seller used exclusively in connection with the Product Line as of September 4, 2014 or as of the date hereof, including, without limitation, all engineering drawings and information, know-how, works of authorship, inventions and ideas used exclusively in the Product Line as of September 2, 2014 or as of the date hereof, excluding United States patent number 6,681,532 B1 (the 'Patent')".

and deliver . . . *all of [Knoll's] rights, title and interest*" in EQUITY, including all goodwill associated therewith.[4]

47.     Under the finalized terms of the APA and the Intellectual Property Assignment Agreement, a true and correct copy of which is incorporated herein and attached hereto as Exhibit 3, ownership of the Intellectual Property transferred to Neutral Posture on September 2, 2014. *See* Exhibit 2 at 1.01(a), 1.01(c).

48.     Knoll agreed to transfer certain EQUITY assets, which included all related Intellectual Property, at the First Closing—the date of the APA's execution, or December 23, 2014.

49.     Knoll also agreed that it would "use commercially practicable efforts to help transfer the business related to the Product Line from Seller to Buyer, including, without limitation, providing [Neutral Posture] commercially reasonable access to certain employees, sales dealers and vendors of [Knoll] and the customers of the [EQUITY] Line."[5]

50.     In exchange for Knoll's agreements under the APA, Neutral Posture agreed to pay $1,000,000.00 as the Purchase Price and to make quarterly royalty payments equal to 2.5% of net sales for a period of five years, the "Deferred Purchase Price." [6]

51.     Neutral Posture was entitled to "set off" the quarterly royalty payments to Knoll with, among other things, any parts or labor costs arising out of work performed on pre-sale product warranties made by Knoll.

52.     Given that Knoll would become an industry competitor, Knoll covenanted that from September 2, 2014 "until the Third Closing or earlier termination of this Agreement, [Knoll] shall not willfully take any action that is intended to be detrimental to the Assets or the Product Line."[7]

---

[4] APA §1.01 (emphasis added).
[5] APA § 4.04(a).
[6] APA § 1.05 and § 10.03.
[7] APA § 4.03.

53.     The Third Closing occurred on June 22, 2015.

54.     Neutral Posture timely made all required APA payments and otherwise fulfilled all of its contractual obligations under the APA.

55.     Since ownership of the EQUITY Mark was transferred to Neutral Posture, Neutral Posture expended approximately $3.7 million dollars promoting and advertising its goods and services under the EQUITY Mark.

56.     EQUITY Mark is distinctive and well-known among the general consuming public of the United States and represents valuable good will owned by Neutral Posture as a result of Neutral Posture's sales, promotion, and advertising the EQUITY Line

C.  *Despite Knoll's Representations and Warranties, Knoll Underhandedly and Willfully Worked to Undermine EQUITY*

57.     Notwithstanding Knoll's contractual duties and representations, throughout 2014 and up to the date of this filing, Knoll took *calculated* steps to frustrate the transition of EQUITY Line's ownership to Neutral Posture and to its overall value.

58.     For example, under §10.07 of the APA, the parties agreed that press releases and public announcements concerning EQUITY Line's sale to Neutral Posture would be mutually approved.

59.     In August 2014, in anticipation of consummating the September 2, 2014 APA, the Parties worked together to draft a press release with mutually agreeable language announcing Neutral Posture's acquisition of the EQUITY Line (the "Press Release").

60.     At the same time the Parties were working on the Press Release, Knoll drafted an email concerning EQUITY's sale to Neutral Posture, to be transmitted to Knoll sales personnel (the "Transmittal Email") alongside the Press Release.

61.     On August 19, 2014, Neutral Posture prepared an initial draft of the Press Release.

62.     Knoll suggested the Press Release be revised to include an explicit cut off date of October 31, 2014 so customers would know exactly when they could begin placing order for the EQUITY Line with Neutral Posture instead of Knoll.

63.     The original draft of Knoll's Transmittal Email also included the October 31, 2014 cut off date and a related instruction: "customers will place their orders for Equity components with Neutral Posture."

64.     Neutral Posture agreed to the inclusion of the cut off date in the Press Release.

65.     After lulling Neutral Posture into believing Knoll would inform the public of the EQUITY transfer timeline, Knoll thereafter failed to issue a single press release about the discontinuation of EQUITY.  Thus, unbeknownst to Neutral Posture Knoll blatantly failed to issue any information for existing EQUITY customers that orders could be placed with Neutral Posture after October 31, 2014.

66.     Instead, Knoll told prospective furniture customers that October 31, 2014 was the last day they could place orders for EQUITY with Knoll.

67.     Knoll's announcement, and its glaring omission of the transfer timeline of EQUITY to Neutral Posture, suggested that manufacture of EQUITY would completely cease after October 31, 2014.

68.     Upon information and belief, Knoll knew that omission of the EQUITY transfer timeline would create a false sense of urgency amongst the customers to purchase EQUITY components from Knoll based on the mistaken impression that their existing EQUITY installations would be incapable of further expansion, repair, or maintenance.  It also created the impression that EQUITY components would not be available after October 31, 2014 from any source,

including from Neutral Posture, who had acquired EQUITY.

69.     Knoll's strategy had precisely the intended consequences.

70.     As a result of Knoll's multiple announcements, Knoll experienced a "massive" rush of EQUITY product orders of approximately $2.3 million dollars in the final two days leading up to the October 31, 2014 deadline.

71.     Around the same time that Knoll disseminated its Press Releases, Knoll directly targeted high-volume Equity line customers and persuaded them to switch to Knoll's competing Dividends and Currents systems office furniture lines after the October 31, 2014 "deadline"—on the false pretext that EQUITY would no longer be available after October 31, 2014.

72.     In another reversal, after consummating the APA, Knoll refused to provide Neutral Posture with Knoll's existing EQUITY customer contact information.

73.     The APA contractually entitled Neutral Posture to existing EQUITY customer contact information.

74.     Without Knoll's representations that it would transfer existing EQUITY customer contact information to Neutral Posture, the APA assets sold would have a considerably lower market price, because access to the existing customer was essential to achieve and maintain the level of sales revenue predicted by Knoll and relied upon by Neutral Posture in valuing the deal.

D.   *State Court Litigation and Subsequent 2022 Acts by Knoll to Undermine Neutral Posture's EQUITY Mark*

75.     Although Neutral Posture's purchase of the EQUITY Line included all rights to the EQUITY Mark, Knoll continued to interfere with Neutral Posture's use of the EQUITY Mark for years after Knoll's use rights had fully extinguished.

76.     Knoll management never instructed Knoll personnel to stop using the EQUITY Mark after the sale to Neutral Posture.

77.     Knoll embedded the EQUITY Mark into its website's metadata.

78.     When consumers use search terms on internet search engines such as Google, the search engines pull results based on information they have gathered from particular websites' metadata.

79.     As a result of Knoll's embedding the EQUITY Mark in its website's code, when consumers ran internet searches for "equity" in the context of office furniture, the search would yield results for Knoll's website not Neutral Posture.

80.     The net effect of this surreptitious infringement was to drive internet traffic (potential sales leads) for "Equity office furniture" to the Knoll website, rather than to the Neutral Posture website.

81.     Indeed, upon information and belief, Knoll intentionally adopted this strategy to confuse potential EQUITY customers by driving them to sections of the Knoll website selling its competing systems furniture products such as Dividends and Horizons.

82.     At the same time that Knoll continued to exploit the EQUITY Mark to Neutral Posture's disadvantage and to Knoll's advantage, sometime after the APA was executed, Knoll adopted the trademark "EQ" as part of its other systems office furniture brand naming (the "EQ Mark").

83.     The EQ Mark is confusingly similar to the EQUITY Mark.

84.     The EQ Mark is comprised of the first two letters of the EQUITY Mark.

85.     Furthermore, the EQ Mark and reference to the EQUITY Mark are used to market Knoll's competing systems office furniture by advertising the ways in which EQ products can functionally integrate with EQUITY products.

86.     Knoll uses the EQ Mark to sell a particular table which is virtually identical to a

table Knoll had previously manufactured and sold under the EQUITY Mark, further fostering the assumption that the EQ and EQUITY marks are associated or affiliated in some manner.

87.     Moreover, Knoll now also markets this EQUITY "rip-off", EQ table, as part of its Dividends line, and advertises it compatibility with EQUITY Line products.

88.     Upon information and belief, consumers of systems office furniture will confuse the EQ Mark with the EQUITY Mark and assume goods sold in connection therewith emanate from the same source.

89.     Upon information and belief, Knoll adopted the EQ Mark intentionally to confuse consumers about the origin of EQ and EQUITY products, to trade on the goodwill that Knoll was required to transfer to Knoll under the terms of the APA, and to divert customers seeking EQUITY products to Knoll instead of Neutral Posture.

90.     As late as June of 2017, Google search results for EQUITY on the Knoll website yielded numerous results for EQUITY products, diverting prospective systems office furniture customers to Knoll's competing products.   A true and correct copy of a Google search of Knoll.com for the term "EQUITY" conducted on June 16, 2017 is incorporated herein and attached hereto as Exhibit 4.

91.     Knoll's efforts to undermine the EQUITY Mark it sought to offload onto Neutral Posture caused devastating harm to Neutral Posture.

92.     In stark contrast to the $10,000,000.00 annual sales that Colzani repeatedly promised Neutral Posture to expect during pre-sale negotiations based on the preceding five years of performance, Neutral Posture's actual sales of EQUITY were a fraction of what they were with Knoll.

93.     Neutral Posture's EQUITY sales are as follows:

| Fiscal Year | Net Annual Sales (USD) |
|---|---|
| 2015 | $1.079 million |
| 2016 | $3.225 million |
| 2017 | $3.439 million |
| 2018 | $2.886 million |
| 2019 | $1.892 million |
| 2020 | $2.932 million |
| 2021 | $2.264 million |

94.    Neutral Posture's net *annual* sales in 2017, its best year with EQUITY, were less than Knoll's net sales for the *six-month period* ending on June 30, 2014.

95.    In the face of Knoll's egregious acts, Neutral Posture commenced an action in the Philadelphia County Court of Common Pleas, Civil Trial Division on June 21, 2017 by filing a Complaint (the "State Court Litigation").

96.    Neutral Posture survived Knoll's challenges through Preliminary Objections and Motion for Summary Judgment and remain pending for resolution at trial: breach of contract (Count I), tortious interference with prospective contractual relations (Count IV), common law unfair competition (Count V), and commercial disparagement (Count VI).

97.    From March 2020, the covid-19 pandemic caused significant delays and disruptions in the proceedings between the parties.

98.    On November 1, 2021, Neutral Posture filed a Chapter 11 (subchapter 5) bankruptcy proceeding in the U.S. Bankruptcy Court for the Southern District of Texas, which case was pending at 21-60086.

99.    The Chapter 11 filing was necessitated in no small part by the catastrophic financial impact Knoll's efforts to undermine the value of Neutral Posture's purchase of the EQUITY Line had.

100.    On November 3, 2021, Neutral Posture filed a Suggestion of Bankruptcy, invoking

the bankruptcy stay pursuant to 11 U.S.C. §362.

101.   On March 2, 2022, the Bankruptcy Court approved Neutral Posture's Plan of Reorganization.

102.   Upon information and belief, sometime following the initiation of the State Court Litigation, Knoll updated its website source code to instruct search engines to not reveal references to the EQUITY Mark on its website.  Exhibit 5, a true and correct copy of the source code to https://www.knoll.com/robots.txt, accessed August 22, 2022.

103.   Notwithstanding the ongoing State Court Litigation between the parties, in early 2022, Knoll issued new catalogues—available for download on its website in Portable Document Format (PDF)—that market products with the EQUITY Mark for sale and that use the EQUITY Mark to promote Knoll's other concurrently listed product lines and brands.

104.   Upon information and belief, because Knoll's website contains code that prevents search engines from revealing references to "EQUITY", Knoll intentionally tried to hide from Neutral Posture that it continues to market EQUITY products for sale.

105.   Knoll's 2022 Price List for "Currents," prominently advertises numerous EQUITY components for purchase.

106.   Some of the EQUITY products Knoll sells include "Replacement duplexes for Equity," "Transitional power connector Equity 2+2," "Transitional power connector Equity 3+3," "Replacement power infeed, Equity panel,"

107.   True and correct copies of excerpts from Knoll's 2022 Price List for "Currents" are indicated in Figures 1, 2, and 3 below:

Power, data and communications components for Service Walls

*replacement components for Equity*

Currents

| description | type | w | d | h | pattern no. | black | orange(-O) or Orange triangle(-T) | no finish |
|---|---|---|---|---|---|---|---|---|
| Replacement duplexes for Equity | Circuit A | | | | ARE1DA | $63. | | |
| | Circuit B | | | | ARE1DB | 63. | | |
| | Circuit C | | | | ARE1DC | 63. | | |
| | Circuit X | | | | ARE1DX | 63. | | |
| | Circuit X, orange face or orange triangle | | | | ARE1DX (O or T) | | 69. | |
| | Circuit Y | | | | ARE1DY | 63. | | |
| | Circuit Y, orange face or orange triangle | | | | ARE1DY (O or T) | | 69. | |
| | Circuit Z | | | | ARE1DZ | 63. | | |
| | Circuit Z, orange face or orange triangle | | | | ARE1DZ (O or T) | | 69. | |
| Transitional power connector Equity 2+2 | 12″ | 61″ | | | ARE1ET1 | | | 277. |
| | 36″ | 85″ | | | ARE1ET3 | | | 349. |
| | 60″ | 109″ | | | ARE1ET5 | | | 400. |
| Transitional power connector Equity 3+3 | 12″ | 61″ | | | ARE1TT1 | | | 328. |
| | 36″ | 85″ | | | ARE1TT3 | | | 400. |
| | 60″ | 109″ | | | ARE1TT5 | | | 446. |
| Replacement power infeed, Equity panel | 2+2 | | | | ARE1EP1 | | | 411. |
| | 3+3 | | | | ARE1TP1 | | | 479. |

*Figure 1*

| Order Code | | Specification Information | Application Notes | |
|---|---|---|---|---|
| Example: | **ARE1ET3** | | Replacement duplexes for Equity convert existing 3+1 terminal blocks in Equity panels to 2+2 when connected to and supplied by Service Wall 2+2 or 3+3 power. | Transitional power connector connects Service Wall power components to Equity panel base power. |
| **ARE1** | Currents/Equity raceway | | | |
| **E** | Eight wire 2+2 | | | Application dimension indicates distance between Service Wall outlet module (at 30″ - 39″H) and perpendicular panel. |
| **T** | Transitional connector | | | |
| **3** | Width | | | |
| | | | | Specify replacement power infeed when supplying power to Service Wall from Equity panel base infeed. |

46

*Figure 2*

-16-

| Order Code | | Specification Information | Application Notes | |
|---|---|---|---|---|
| Example: | **AB1 AC24 117** | *Specify painted finishes for support column, C-leg, and brackets.* | Specify worksurface cantilever and end support brackets to attach worksurfaces to Service Walls. | Adjustable bridging cantilever supports adjacent 48"W straight or corner worksurfaces. |
| AB1 | Bracket | *Fence end bracket kit includes a left and a right handed bracket.* | Specify two cantilever brackets to support any 24"D Currents, Reff, Equity, Dividends, or Cascade worksurface up to 84" wide, or one back edge of corner worksurface. Specify three cantilever brackets to support any 24"D Currents, Reff, Equity, Dividends or Cascade worksurface greater than 84" wide. Specify two end support brackets to support one end of straight, conference, or arc-shape surface. | End support brackets adjust 23"-33"H (24" to 34" top height). Fixed height brackets support worksurface at 28"H and 29⅜" H. |
| AC | Type | *Specify paint finish for end bracket.* | | Fence end brackets attach to Fence to support one end of rectilinear or one back edge of a corner worksurface when the other ends are properly supported by legs, storage or panel brackets. |
| 24 | Depth | | | Fence end brackets support the underside of the worksurface in 1" increments from 26" to 28" (27" to 29" top height). |
| 117 | Finish | | Adjustable height cantilever and bridging cantilever brackets support underside of worksurface in 1" increments from 23" to 33"H (24" to 34" top height). | |

59

*Figure 3*

108.    Knoll sells EQUITY branded components through its KnollExtra 2022 Price List.

109.    True and correct copies of excerpts from the KnollExtra catalog are depicted in

Figures 4 and 5 below:

| Order Code | | Ordering Information | Custom Options | Construction |
|---|---|---|---|---|
| Example: | **OA-SLV-A-E** | *Specify:* 1. Pattern number 2. Thickness (VDT sleeve only) 3. Finish | Custom colors available upon sample chip approval. Contact your Knoll sales representative or Customer Service for complete pricing information. | *VDT sleeve:* Heavy-gauge steel in painted finish. Felt backing protects worksurface. |
| OA-SLV | VDT sleeve | | | Manufactured in the United States |
| A | 1⅛" sleeve | *VDT sleeve worksurface thicknesses:* 1⅛" (A): Equity, Postformed, Reff 1⅜" (B): Postformed, Reff 2½" (C): Reff | | *Surf Board:* Rigid steel plate with 1" thick rolled front detail. Black rubber bumpers and non-scuffing felt back. |
| E | Soft grey finish | *VDT sleeve finishes:* Soft Grey (E) Medium Metallic Grey (J) Soft Touch Light Grey (GS) Soft Touch Black (BS) | | |

*Figure 4*

**Sapper Monitor Arm Collection Mounting Options by Product Line**

| | Two-Piece Table Clamp | Deep Table Clamp | Heavy Duty Table Clamp | Grommet Mount | Fixed Table Mount | Antenna Center Beam Center / Side Mounts | Slat Wall* Direct Wall Mounts* |
|---|---|---|---|---|---|---|---|
| Postformed | Yes | Yes | Yes | Yes | Yes | No | No |
| Postformed Network | No | No | No | Yes, but needs spacer through CPD | Yes | No | No |
| Currents | Yes | Yes | Yes | Yes | Yes | No | Yes |
| Autostrada AS1 | Yes (non tapered edge only) | Yes | Yes | Yes | Yes | No | Yes |
| Autostrada AS2 | Yes (non tapered edge only) | Yes | Yes | Yes | Yes | No | No |
| Autostrada AS3 | Yes (non tapered edge only) | Yes | Yes | Yes | Yes | No | Yes |
| Crinion Open Table / AS4 | Yes (non tapered edge only) | Yes | Yes | No | Yes | No | Yes** |
| Reff | Yes | Yes | Yes | Yes | Yes | No | No |
| Dividends Horizon | Yes | Yes | Yes | No | Yes | No | Yes** |
| Equity | Yes | Yes | Yes | No | Yes | No | No |
| Cascade Edge Worksurfaces | Yes (non tapered edge only) | Yes | Yes | Yes | Yes | No | No |
| Template | Yes | Yes | Yes | No | Yes | No | No |
| Graham Collection | Yes | Yes | Yes | No | Yes | No | No |
| Antenna | Yes | Yes | Yes | Yes | Yes | Yes | No |
| Upstart | Yes | Yes | Yes | No | Yes | No | No |
| Interaction | Yes | Yes | Yes | No | Yes | No | No |
| Magnusson | Yes | Yes | Yes | Yes | Yes | No | No |
| Propeller | Yes | Yes | Yes | Yes | Yes | No | No |

*See Slat Wall and Direct Wall Weight Limits and Notes in the following chart.
**Not an option for Sapper 50 monitor arm.

*Figure 5*

110. Knoll dedicates an entire page within its 24 Hour Response Price Book to the sale of EQUITY Mark paints, available in both 12 oz Spray and (2) 1 oz Bottle options.

111. A true and correct copy of an excerpt from the Knoll 24 Hour Response Price Book is indicated below:

### Equity - Paint Group 0
#### *****METAL SURFACES ONLY*****SMOOTH FINISH*****
#### (Product shipping from Muskegon)

| Finish Code | Color Description | 12 oz Spray | (2) 1 oz Bottles | Quart | Gallon |
|---|---|---|---|---|---|
| | List Price: | $72.00 | $30.00 | N/A | N/A |
| E | Soft Grey | HLKRZ50E | HLKRTOUCH4E | N/A | N/A |
| D | Dark Neutral | HLKRZ50D | HLKRTOUCH4D | N/A | N/A |
| S/Y2 | Slate/Medium Grey | HLKRZ50Y2 | HLKRTOUCH4S | N/A | N/A |
| R | Taupe | HLKRZ50R | HLKRTOUCH4R | N/A | N/A |
| 3 | Silver | HLKRZ503 | HLKRTOUCH43 | N/A | N/A |
| Y3 | Dark Grey | HLKRZ50Y3 | HLKRTOUCH4Y3 | N/A | N/A |

*Figure 6*

112. Knoll markets its so-called EQ Table by using the EQUITY Mark in its written promotional materials.

113.   Knoll's 2022 Price List for the Dividends and Horizon systems office furniture lines promotes as a feature that its EQ table "[a]ccepts [EQUITY] drawers."

114.   A true and correct copy of an excerpt from the Knoll 2022 Price List for the Dividends and Horizon lines is below:



### Dividends Horizon EQ Tables

Dividends Horizon

| description | surface | type | w | d | h | pattern no. | P1 | P2 | P3 |
|---|---|---|---|---|---|---|---|---|---|
| round table | Laminate | | 29¾" | 29¾" | 29" | ET1RT30 | $1,123. | $1,183. | $1,236. |
| | Laminate | | 35¾" | 35¾" | 29" | ET1RT36 | 1,207. | 1,265. | 1,329. |
| | Laminate | | 41¾" | 41¾" | 29" | ET1RT42 | 1,605. | 1,691. | 1,767. |
| | Laminate | 4 columns - 4 legs | 59¾" | 59¾" | 29" | ET1RT60 | 3,553. | 3,739. | 3,916. |
| | Laminate | 5 legs | 47¾" | 47¾" | 29" | ET1RT48 | 2,003. | 2,102. | 2,198. |
| | Laminate | with casters | 35¾" | 35¾" | 26⅜" | ET1RT36C | 1,586. | 1,669. | 1,746. |
| square table | Laminate | | 24" | 24" | 16" | ET1ST2416 | 813. | 851. | 892. |
| | Laminate | | 29¾" | 29¾" | 29" | ET1ST30 | 1,075. | 1,128. | 1,183. |
| | Laminate | | 35¾" | 35¾" | 29" | ET1ST36 | 1,145. | 1,203. | 1,258. |
| | Laminate | | 41¾" | 41¾" | 29" | ET1ST42 | 1,528. | 1,603. | 1,681. |
| | Laminate | 4 columns - 4 legs | 59½" | 59½" | 29" | ET1ST60 | 3,384. | 3,552. | 3,721. |
| | Laminate | 6 legs | 47¾" | 47¾" | 29" | ET1ST48 | 1,904. | 1,997. | 2,090. |
| | Laminate | with caster | 22¼" | 22¼" | 26⅜" | ET1ST22C | 1,302. | 1,364. | 1,428. |
| rectangular table | Laminate | | 47¾" | 29¾" | 29" | ET1RCT3048 | 1,874. | 1,967. | 2,063. |
| | Laminate | | 58½" | 35½" | 29" | ET1RCT3660 | 2,701. | 2,831. | 2,972. |
| | Laminate | | 59¾" | 29¾" | 29" | ET1RCT3060 | 2,286. | 2,402. | 2,518. |
| | Laminate | | 71¾" | 29¾" | 29" | ET1RCT3072 | 2,701. | 2,831. | 2,972. |
| | Laminate | | 71¾" | 35¾" | 29" | ET1RCT3672 | 3,198. | 3,356. | 3,519. |
| | Laminate | | 83¾" | 41¾" | 29" | ET1RCT4284 | 4,280. | 4,492. | 4,706. |
| | Laminate | 4 columns | 95¾" | 47¾" | 29" | ET1RCT4896 | 5,520. | 5,795. | 6,069. |
| | Laminate | Accepts Equity drawers | 69¼" | 34" | 29" | ET1RCT3469 | 4,063. | 4,265. | 4,466. |
| | Laminate | Accepts Equity drawers | 79¼" | 34" | 29" | ET1RCT3479 | 4,063. | 4,265. | 4,466. |

*Figure 7*

115.   Knoll's 2022 Price List for the Standard Specials Systems, which markets several of Knoll's competing systems office furniture lines, advertises worksurfaces using the EQUITY Mark.

116.   Knoll's 2022 Price List for the Standard Specials Systems provides order codes for "**Equity**/Dividends Style File Tops (Calibre Files)", as well as the "**Equity**/Dividend Edge."

117.   True and correct copies of excerpts from the Knoll's 2022 Price List for the Standard Specials Systems are shown below in Figures 8 and 9:



*Figure 8*



*Figure 9*

118.   Knoll's 2022 Price List for the Standard Specials Systems product descriptions would lead any reasonable consumer to believe that Knoll is selling EQUITY Mark products.

119.   On information and belief, Knoll's marketing department continues to use the

EQUITY Mark in other promotion of its competing systems office products.

120.     Unless this Court intervenes, Knoll will no doubt continue its willful infringement of Neutral Posture's EQUITY Mark and continued breach of the parties' agreement.

## COUNT I

**(15 U.S.C. § 1114 – Infringement of Federally Registered Trademarks)**

121.     Neutral Posture repeats and realleges the allegations of the foregoing paragraphs as if fully set forth herein.

122.     Neutral Posture owns all right, title, and interest in its federally registered, valid and protectable EQUITY Mark.

123.     Members of the consuming public have come to associate Neutral Posture's EQUITY Mark with a single source – namely Neutral Posture, which owns the valuable goodwill symbolized by the EQUITY Mark.

124.     Neutral Posture's rights in the EQUITY Mark predates Knoll's first use of the EQ Mark.

125.     Knoll's assignment of all right, title and interest in the EQUITY Mark to Neutral Posture in 2014 render any further use of the identical EQUITY Mark by Knoll after December 23, 2014 unauthorized by the lawful owner, Neutral Posture and constitutes an infringement of Neutral Posture's rights.

126.     Neutral Posture's rights in its EQUITY Mark predate Knoll's unauthorized and infringing use and adoption of the EQ mark, which is similar in sight, sound, meaning and commercial impression to the EQUITY Mark.

127.     Neutral Posture offers, distributes and sells furniture systems, furniture wall panels and related goods under its EQUITY Mark through the same channels of trade and to the same

consumers as Knoll offers, distributes and sells furniture systems, furniture wall panels and related goods under the infringing EQUITY and EQ marks.

128.    Knoll's unauthorized use in commerce of the identical EQUITY Mark and confusingly similar EQ mark are likely to cause confusion, or cause mistake or deceive, in violation of the Lanham Act.

129.    Knoll's blatant, unauthorized, and continued use of the EQUITY trademark after it was sold *by Knoll* to Neutral Posture, and of the confusingly similar EQ mark constitutes, by all metrics, trademark infringement and such infringement is nothing short of willful and wanton and in reckless disregard of  Neutral Posture's Intellectual Property rights.

130.    As a direct and proximate result of Knoll's unauthorized use of the EQUITY and EQ Marks, Plaintiff has suffered and will continue to suffer substantial injury to its business, reputation, and goodwill, along with losses of revenues and profits.

131.    By using the EQUITY and EQ Marks without Neutral Posture's approval or consent, Knoll is willfully infringing Neutral Posture's rights with the intent to trade on the fame and goodwill associated with the EQUITY and EQ Marks.

132.    Neutral Posture has been, is now, and will be irreparably harmed by Knoll's wrongful acts, unless enjoined by this Court.  There is no adequate remedy at law for the harm caused by the wrongful acts alleged herein.

133.    Further, Neutral Posture is entitled to heightened monetary damages, along with attorneys' fees and costs, resulting from Knoll's willful infringement

## **COUNT II**

### **(15 U.S.C. § 1125(a) – Unfair Competition and False Designation of Origin)**

134.    Neutral Posture repeats and realleges the allegations of the foregoing paragraphs as

if fully set forth herein.

135.     This claim arises under 15 U.S.C. § 1125(a), and is for Knoll's use in commerce of false designations of origin, false descriptions and false representations.

136.     Through longstanding use, Neutral Posture owns all right, title and interest in its federally registered, valid, and protectable EQUITY Mark.

137.     Members of the consuming public have come to associate Neutral Posture's EQUITY Mark with a single source – namely Neutral Posture, which owns the valuable goodwill symbolized by the EQUITY Mark

138.     Neutral Posture's rights in the EQUITY Mark predate Knoll's first use of the EQ Mark.

139.     Knoll's assignment of all right, title and interest in the EQUITY Mark to Neutral Posture in 2014 render any further use of the identical EQUITY Mark by Knoll after December 23, 2014 unauthorized by the lawful owner, Neutral Posture and constitutes an infringement of Neutral Posture's rights. Neutral Posture's rights in its EQUITY Mark predate Knoll's unauthorized and infringing use and adoption of the EQ mark, which is similar in sight, sound, meaning and commercial impression to the EQUITY Mark.

140.     Neutral Posture offers, distributes and sells furniture systems, furniture wall panels and related goods under its EQUITY Mark through the same channels of trade and to the same consumers as Knoll offers, distributes and sells furniture systems, furniture wall panels and related goods under the infringing EQUITY and EQ marks.

141.     The EQUITY Mark is in full force and effect.

142.     The EQUITY Mark is nationally recognized, including within the Eastern District of Pennsylvania as being affixed to goods of the highest quality from Neutral Posture.

143.    Knoll's unauthorized use in commerce of the identical EQUITY Mark and the confusingly similar EQ Mark are likely to cause confusion, cause mistake, or deceive as to the affiliation, connection, or association of Knoll with Neutral Posture, or as to the origin, sponsorship, or approval of Knoll's goods or commercial activities by another person, in violation of the Lanham Act.

144.    Knoll's blatant unauthorized and continued use of the EQUITY trademark after it was sold *by Knoll* to Neutral Posture, and of the confusingly similar EQ mark constitutes, by all metrics, unfair competition and false designation of origin and such activities are nothing short of willful and wanton and in reckless disregard of Neutral Posture's intellectual Property rights.

145.    As a direct and proximate result of Knoll's unauthorized use of the EQUITY and EQ Marks, Neutral Posture has suffered and will continue to suffer substantial injury to its business, reputation, and goodwill, along with losses of revenues and profits.

146.    By using the EQUITY and EQ Marks without Neutral Posture's approval or consent, Knoll has willfully infringed Neutral Posture's rights with the intent to trade upon the tremendous goodwill and recognition associated with the EQUITY Mark.

147.    Knoll's acts as alleged herein were committed with the intent to pass off Knoll's goods and services as the goods and services of, approved by, sponsored by, or affiliated with Neutral Posture, and with the intent to deceive and defraud the public.

148.    The intentional nature of Knoll's wrongful acts renders this case exceptional pursuant to 15 U.S.C. § 1117.

149.    Neutral Posture has been, is now, and will be irreparably harmed by Knoll's wrongful acts, unless enjoined by this Court.  There is no adequate remedy at law for the harm caused by the wrongful acts alleged herein.

150.    Further, Neutral Posture is entitled to heightened monetary damages, along with attorneys' fees and costs, resulting from Knoll's unfair competition.

**COUNT III**

**(Common Law Trademark Infringement)**

151.    Neutral Posture repeats and realleges the allegations of the foregoing paragraphs as if fully set forth herein.

152.    Through longstanding use, Neutral Posture owns all right, title and interest in its registered, valid, and protectable EQUITY Mark.

153.    Members of the consuming public have come to associate Neutral Posture's EQUITY Mark with a single source – namely Neutral Posture, which owns the valuable goodwill symbolized by the EQUITY Mark.

154.    Neutral Posture's rights in the EQUITY Mark predate Knoll's first use of the EQ Mark.

155.    Knoll's assignment of all right, title and interest in the EQUITY Mark to Neutral Posture in 2014 render any further use of the identical EQUITY Mark by Knoll after December 23, 2014 unauthorized by the lawful owner, Neutral Posture and constitutes an infringement of Neutral Posture's rights.

156.    Neutral Posture's rights in its EQUITY Mark predate Knoll's unauthorized and infringing use and adoption of the EQ mark, which is similar in sight, sound, meaning and commercial impression to the EQUITY Mark.

157.    Neutral Posture offers, distributes and sells furniture systems, furniture wall panels and related goods under its EQUITY Mark through the same channels of trade and to the same consumers as Knoll offers, distributes and sells furniture systems, furniture wall panels and related

goods under the infringing EQUITY and EQ marks.

158.    Knoll's blatant unauthorized and continued use of the EQUITY trademark after it was sold *by Knoll* to Neutral Posture, and of the confusingly similar EQ mark constitutes, by all metrics, trademark infringement and that such infringement is nothing short of willful and wanton and in reckless disregard of Neutral Posture's intellectual Property rights.

159.    The foregoing acts of Knoll are intended to cause, have caused, and are likely to continue to cause confusion and mistake among consumers, the public, and the furniture trade as to whether the furniture systems, furniture wall panels and related goods are affiliated with, sponsored by, or endorsed by Neutral Posture.

160.    On information and belief, Knoll has acted with knowledge of Neutral Posture's ownership of and rights in the EQUITY Mark and with deliberate intent or willful blindness to unfairly benefit from the incalculable goodwill symbolized thereby.

161.    Knoll's acts constitute trademark infringement in violation of Pennsylvania common law.

162.    On information and belief, Knoll has made and will continue to make substantial profits or gains to which they are not in law or equity entitled.

163.    On information and belief, Knoll intends to continue its infringing acts unless restrained by this Court.

164.    Knoll's acts have damaged and will continue to damage Neutral Posture, and Neutral Posture has no adequate remedy at law.

165.    Further, Neutral Posture is entitled to heightened monetary damages, along with attorneys' fees and costs, resulting from Knoll's willful infringement

## COUNT IV

### (Common Law Unfair Competition)

166.     Neutral Posture repeats and realleges the allegations of the foregoing paragraphs as if fully set forth herein.

167.     Through longstanding use, Neutral Posture owns all right, title and interest in its registered, valid, and protectable EQUITY Mark.

168.     Members of the consuming public have come to associate Neutral Posture's EQUITY Mark with a single source – namely Neutral Posture, which owns the valuable goodwill symbolized by the EQUITY Mark

169.     Neutral Posture's rights in the EQUITY Mark predate Knoll's first use of the EQ Mark.

170.     Knoll's assignment of all right, title and interest in the EQUITY Mark to Neutral Posture in 2014 render any further use of the identical EQUITY Mark by Knoll after December 23, 2014 unauthorized by the lawful owner, Neutral Posture and constitutes an unfair competition with Neutral Posture.

171.     Neutral Posture's rights in its EQUITY Mark predate Knoll's unauthorized and infringing use and adoption of the EQ mark, which is similar in sight, sound, meaning and commercial impression to the EQUITY Mark.

172.     Neutral Posture offers, distributes and sells furniture systems, furniture wall panels and related goods under its EQUITY Mark through the same channels of trade and to the same consumers as Knoll offers, distributes and sells furniture systems, furniture wall panels and related goods under the infringing EQUITY and EQ marks

173.     Knoll, without authorization from Neutral Posture, has used and continues to use

spurious designations that are identical to, substantially indistinguishable from, or confusingly similar to the EQUITY Mark in connection with the purchase and the offer for sale of the furniture systems, furniture wall panels and related goods.

174.    Neutral Posture and Knoll are competitors in the furniture trade, and compete for a common pool of customers. As alleged herein, Knoll has engaged in unfair, deceptive, or fraudulent conduct, which is likely to cause, if it has not already, customer confusion in violation of Pennsylvania common law.

175.    Through Knoll's unauthorized use of the EQUITY Mark in commerce, Knoll has engaged in unfair competition and/or unfair or deceptive practices that are causing or are likely to cause confusion or deception about the source or sponsorship of Knoll's furniture systems, furniture wall panels and related goods.

176.    Through Knoll's wrongful acts alleged herein, Knoll has directly created a likelihood of confusion about the source and sponsorship of Knoll's products.

177.    The foregoing acts of Knoll constitute unfair competition in violation of Pennsylvania common law.

178.    With full knowledge of Neutral Posture's rights in the EQUITY Mark, Knoll made false and misleading representations to customers that the furniture systems, furniture wall panels and related goods that Knoll advertises and offers for sale are associated with Neutral Posture.

179.    Knoll is liable to Neutral Posture for unfair competition under Pennsylvania law, because Knoll's conduct is tortious and has deprived Neutral Posture of customers and other prospects.

180.    The resemblance between the furniture systems, furniture wall panels and related goods and genuine EQUITY-brand furniture is so close that Knoll's conduct is likely to confuse

any prospective buyers or customers about the source or sponsorship of the products.

181.    Knoll's blatant unauthorized and continued use of the EQUITY trademark after it was sold *by Knoll* to Neutral Posture, and of the confusingly similar EQ mark constitutes, by all metrics, trademark infringement and that such infringement is nothing short of willful and wanton and in reckless disregard of Neutral Posture's intellectual Property rights.

182.    On information and belief, Knoll's acts alleged herein were committed with the intent to deceive and defraud the public in order to gain an increase in their sales, customer base, and share in the furniture trade and/or eliminate Neutral Posture from the furniture trade.

183.    On information and belief, Knoll will continue to make substantial profits and/or gains to which it is not entitled in law or equity if not enjoined from promoting, offering to sell, and selling the furniture systems, furniture wall panels and related goods.

184.    On information and belief, Knoll intends to continue its unlawful acts unless restrained by this Court.

185.    Knoll's acts have damaged and will continue to damage Neutral Posture, and Neutral Posture have no adequate remedy at law.

## COUNT V

**(Violation of Pennsylvania's Unfair Trade Practices & Consumer Protection Law, 73 P.S. § 201-2 *et seq.* – Unfair Competition)**

186.    Neutral Posture repeats and realleges the allegations of the foregoing paragraphs as if fully set forth herein.

187.    Knoll has passed its goods off as those of Neutral Posture's by engaging in the conduct complained of herein.

188.    Knoll has disparaged Neutral Posture's goods by engaging in the type of false and misleading representations complained of herein.

189.    Knoll has engaged in other fraudulent and deceptive conduct which creates a likelihood of confusion or misunderstanding within the marketplace.

190.    Neutral Posture has suffered actual damages as a direct and proximate result of Knoll's conduct.

191.    Knoll has thereby engaged in unfair competition and unfair or deceptive acts or practices under the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

1.    That judgment be entered as follows against Defendant and in favor of Plaintiff on all Counts that:

   a.    Defendant infringed Plaintiff's federally registered trademarks pursuant to 15 U.S.C. § 1114;

   b.    Knoll's unlawful use of the EQUITY and EQ Marks in interstate commerce constitutes unfair competition and false designation of origin pursuant to 15 U.S.C. § 1125(a);

   c.    Defendant has infringed Plaintiff's common law trademark rights;

   d.    Defendant has unfairly competed, and is currently unfairly competing, with Plaintiff in violation of Plaintiff's common law rights; and

   e.    Defendant has been unjustly enriched by the distribution and sale of the furniture systems, furniture wall panels and related goods.

2.    An order requiring that Defendant and any subsidiaries, officers, agents, servants, employees, owners, and representatives, and all other persons or entities in active concert or participation with Defendant, be preliminarily enjoined, permanently enjoined, and restrained from:

a.   making any unauthorized use of the EQUITY or EQ Marks, or any reproduction, counterfeit, copy, or colorable imitation thereof, in connection with the sale of any goods or offering of any services;

b.   manufacturing, distributing, advertising, marketing, promoting, offering for sale, or selling any goods, wares, or services, including, but not limited to, all furniture, or any other goods, with marks or trade dress that look confusingly similar to any of the EQUITY or EQ Marks, as well as any other forms of markings, packaging, labels, containers, articles, products, displays, signs, circulars, kits, literature, materials, receptacles, catalogs, price lists, promotional materials, or websites and the like bearing a reproduction, counterfeit, copy, or colorable imitation of the EQUITY or EQ Marks;

c.   using any mark, trade dress, design, statement, or representation that may be calculated to falsely represent or that has the effect of falsely representing that the services or products of Defendant are in any way sponsored by, originate with, or are associated or approved by Plaintiff;

d.   falsely representing itself or its goods or services as affiliated with, connected with, associated with, or approved by Plaintiff;

e.   advertising, marketing, promoting, offering for sale, selling, importing, exporting, distributing, and/or transferring furniture and related products complained of herein and/or anything confusingly similar thereto, or any reproduction, counterfeit, copy, or colorable imitation thereof, and/or any other of the EQUITY or EQ Marks, through any means whatsoever, including, but not limited to, retail, wholesale, via the Internet, mail order, telephone, or any other method of interstate or intrastate commerce;

f.   doing any other act or thing calculated or likely to cause confusion or mistake in the minds of members of the public, including prospective customers of Plaintiff, as to the source of the goods offered, distributed, marketed, advertised, or sold by Defendant, or as to whether there is a connection between Plaintiff and Defendant; and

g.   assisting, aiding, or abetting any other person or entity in engaging in any of the acts set forth in (a) through (f) above;

3.   An order that all products, labels, packaging, wrappers, signs, prints,

banners, posters, brochures, catalogs, price lists, websites, or other advertising, promotional, or marketing materials in Defendant's possession, custody, or control, or in the possession, custody, or control of any of their agents, that feature any of the EQUITY or EQ Marks or any other goods that may infringe EQUITY or EQ Marks be removed and destroyed, at Defendant's cost and expense, along with the means for making the same;

4.     An order that Defendant files with this Court and serves upon Plaintiff within 30 days after entry of the injunction a report in writing, under oath, setting forth in detail the manner and form in which Defendant has complied with the injunction entered by this Court;

5.     Damages in an amount to be proven at trial sufficient to compensate Plaintiff for all damages caused by Defendant's conduct, including disgorgement of Defendant's profits, with such damages to be trebled;

6.     Disgorgement of all profits or other unjust enrichment obtained by Defendant as a result of Defendant's conduct complained of herein, with the amount of such profits increased to the extent they are inadequate to compensate Plaintiff for the harm incurred as a result of Defendant's acts;

7.     An accounting of all financial records of Defendant;

8.     All allowable costs associated with this action;

9.     Plaintiff's attorneys' fees under 15 U.S.C. § 1117;

10.    Pre- and post-judgment interest; and

11.    Any and all additional relief this Court deems just under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby requests a trial by jury of any issues so triable.

Respectfully submitted,

**ROYER COOPER COHEN BRAUNFELD LLC**
By: */s/ Joshua Upin*
Joshua Upin, Esquire
Kira N. Lum, Esquire
Two Logan Square
Date: August 22, 2022          100 North 18th Street, Suite 710
Philadelphia, PA 19103
jupin@rccblaw.com
klum@rccblaw.com
267-546-0114 (phone); 484-362-2630 (fax)

*Counsel for Plaintiff, Neutral Posture, Inc.*